### In re S.A. MECHANICAL, INC., Debtor.

### Bankruptcy No. B–84–755–PHX–GBN

United States Bankruptcy Court,
D. Arizona.

July 16, 1985.

James P. Hendricks, Kaplan, Jacobowitz, Hendricks & Bosse, P.A., Phoenix, Ariz., for debtor.

Janet Smith Hepner, Ward & Keenan, Ltd., Phoenix, Ariz., for Sheet Metal Workers Local No. 359.

## MEMORANDUM OF DECISION AND ORDER

GEORGE B. NIELSEN, Jr., Bankruptcy Judge.

■ The circumstances here involve consideration whether S.A. Mechanical, Inc. ("debtor") should be permitted to reject a collective bargaining agreement implemented pre-petition between debtor's collective bargaining agent, Air Conditioning Contractors of Arizona, and Sheet Metal Workers' International Association, Local Union Number 359 ("union"). Because debtor's conduct fails to meet the requisite standard for rejection of such agreements, the union's refusal to accept debtor's modifications at the one and only negotiation session held between the parties was with good cause. Accordingly, the equities do not favor rejection of the collective bargaining agreement at this time. *In re Fiber Glass Industries*, 49 B.R. 202, 203–04 (Bankr.N.D.N.Y.1985).

Debtor's March 23, 1984 filing of its voluntary Chapter 11 petition had the effect of suspending the enforceability of the collective bargaining agreement. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984). The contract cannot be again enforceable unless and until debtor assumes it. *Supra*, at 1199; *In re Air Florida Systems*, 48 B.R. 440, 443 (Bankr.S.D.Fla.1985). Because debtor's filing predates the 1984 Bankruptcy Amendments, it is *Bildisco* and not Amended Code § 1113 which controls here. *See* Act of July 10, 1984, P.L.

98–353, Title III, Subtitle J, § 541(c), 98 STAT. 391; *Air Florida, supra,* at 443.

The *Bildisco* decision establishes an equitable standard by which to measure rejection of an executory contract and permits S.A. Mechanical to ignore its union agreement immediately upon filing its bankruptcy case. By contrast, 11 U.S.C. § 1113 provides "an elaborate and thorough-going revision of the rejection process ... with a number of safeguards designed to insure that employers cannot use Chapter 11 solely to rid themselves of their union, but only propose modifications of the agreement that are truly necessary for the firm's survival." *In re K & B Mounting,* 50 B.R. 460 (Bankr.N.D.Ind.1985).

█ As a result, since debtor has not assumed the contract it remains unenforceable and the union is precluded from indirect enforcement of the contract by reference of the dispute to the National Joint Adjustment Board. 104 S.Ct., at 1199–1200.

Under *Bildisco* standards, S.A. Mechanical may reject the contract if it has bargained in good faith with the union over the terms and conditions of a possible new contract. *Supra,* at 1201; *N.L.R.B. v. Superior Forwarding,* 762 F.2d 695 CCH B.L.R. ¶ 70,559, at 87,098 (8th Cir.1985).

Debtor's President, Richard J.G. Jewell,[1] decided some two weeks prior to a meeting with union representatives that if his sheet metal fabrication operation could not receive individualized relief under its existing labor contract, then a Chapter 11 bankruptcy petition would have to be filed. Accordingly, he sought bankruptcy legal advice some two to four weeks prior to the meeting, incurring legal expenses.

The requested relief was a $10 per hour crew rate, computed by Jewell through discussions with other subcontractors, analyzing bids he maintained in a bid log and from projections of Corporate Controller Richard D. Abrahamson, C.P.A. In March, 1984, Abrahamson projected a June-July, 1984 loss of $250,000 based on normal monthly overhead of $45,000–$50,000 and sales volume.

Crew costs are determined by the mix of workers of varying experience and wage rates placed on a crew, all of whom receive a base wage, health benefits and incur certain tax obligations for the employer.

Because of the decline in construction activity and the increase in the number of nonunion (nonsignatory) competitors, union officials had instituted a program of relief measures for signatory contractors. These included lowering crew costs by imposition of a "helper" or pre-apprentice classification workers receiving $4.70 per hour plus full health and welfare benefits but without employer contribution for pension or apprenticeship training. Journeyman rates under the 1982 contract started at $16 per hour and eventually ran to $16.50.

Besides creation of the helper classification in the 1982 contract, the International Union's resolution 78 provides employer relief on identified, targeted projects by allowing signatories to bid at a reduced wage cost. The targeting procedure was instituted in 1983.

The 1984–1985 extended agreement, informally adopted on March 22, rolled wages back to $15 per hour, allowed increased crew utilization of lower wage apprentices and pre-apprentices, lowered pension contribution rates for apprentices, adjusted or eliminated certain wage travel zones and eliminated certain holidays. In return for these concessions, the Air Conditioning Contractors Association, the bargaining agent for debtor and other union contractors, agreed to extend the master contract. Labor cost savings are estimated at 15%.

Regardless, debtor's management decided it could not continue to compete with the ever increasing number of nonsignatory subcontractors bidding for project work. The parties met at debtor's request on the morning of March 23, 1984 for 30 to 45 minutes. Rather than negotiate, management instead presented essentially a "take

---

1. Mr. Jewell owns the corporation with his wife, who is also an officer. Both before and after filing of the petition, debtor has remained solvent and continues to pay management salaries of $40,330 and $31,200, respectively, to the spouse officers.

it or leave it" crew cost reduction proposal. In the event of nonacceptance, the union was informed that bankruptcy would be filed and the contract rejected. The request of union business manager Jack D. Stewart for additional negotiation sessions was denied. On occasion, the union has exchanged letters of understanding with individual contractors which deviated in certain respects from the master agreement. Its normal procedure, however, is to hold signatories to the master contract.

Later the same day, debtor filed its petition and notice of rejection of the contract. A formal motion to reject the agreement was filed on March 27, 1984. 11 U.S.C. § 365(a).

The March 23 meeting was not a labor negotiation in any sense of the word. Nor did any negotiation occur in the brief Jewell visit of March 21 or the parties' prior telephone conversations utilized to set the March 23 meeting. An ultimatum that a bankruptcy petition and contract rejection motion will be subsequently filed if labor does not agree to a large wage cut and elimination of pension and health benefits does not meet *Bildisco* standards. The immediate result of management's actions was the addition of 18 of debtor's 22 union employees to the bottom of the union's 275 out of work member's list, as well as reduction of fringe benefits and pay for those that remained. By contrast, the 1984–85 extention negotiations ran in several sessions from February to March with each side starting with initial positions and subsequent compromise.

At no time in the 30–45 minute meeting did debtor offer to make reductions in its demands. *Cf. In re Allied Delivery Service Co.*, 49 B.R. 700, CCH B.L.R. ¶ 70,-506, at 86,942 (Bankr.N.D.Oh.1985) (§ 1113 case). Nor did it participate in multiple bargaining sessions with the union. *Cf. In re Air Florida System*, 48 B.R., at 443.

The sincerity of management's beliefs is not questioned. Mere disagreement between the parties does not compel a finding of management bad faith. *In re Salt Creek Freightways*, 47 B.R. 835, 12 B.C.D. 1113, 1115–16 (Bankr.D.Wyo.1985). The economic downtrend in the industry at the time and increasing dominance of nonsignatory competitors are facts which the union cannot ignore. Regardless, an abbreviated "take it or leave it" presentation, no matter how well documented, cannot suffice for the good faith bargaining envisioned by the Supreme Court. Accordingly, debtor's motion to reject the collective bargaining agreement is denied without prejudice.

By resolution of the motion on its merits, I do not reach the various other complex labor issues urged by the parties, including the interest arbitration extention clause of Article I, Section 8, and whether the 1982–84 master agreement and 1984–85 modification constitute one or two separate collective bargaining contracts. Certainly, the normal course is to resolve a mootness issue prior to resolution on the merits. Regardless, given the current unenforceability of the agreement and mindful that the Bankruptcy Court is not to be diverted from its customary area of expertise into the labor field, I will not now reach those issues. 104 S.Ct., at 1200.

Pursuant to Rule 7052, *F.Bk.R.*, the above constitutes my findings and conclusions.

ORDERED ACCORDINGLY.