## In re VALLEY KITCHENS, INC., Debtor.

### Bankruptcy No. 1–85–00278.

United States Bankruptcy Court, S.D. Ohio, W.D.

June 6, 1985.

---

David M. Cook, Kircher & Phalen, Cincinnati, Ohio, for Local Union No. 415 Industrial, Ohio Valley Carpenters' Dist. Council, United Brotherhood of Carpenters and Joiners of America, AFL–CIO.

Paul A. Nemann, Cohen Todd, Kite & Stanford, Cincinnati, Ohio, for debtor.

### DECISION RE REJECTION OF COLLECTIVE BARGAINING AGREEMENT.

BURTON PERLMAN, Bankruptcy Judge.

Debtor is a party to a collective bargaining agreement dated June 23, 1983. The other party is Local Union No. 415 Industrial, Ohio Valley Carpenters' District Council, United Brotherhood of Carpenters and Joiners of America, AFL–CIO (hereafter "Union"). Pursuant to 11 U.S.C. § 1113, debtor has moved to reject such agreement. The matter came on for hearing at which time testimony was taken. We then reserved decision.

Ralph E. Kinsworthy is president of the debtor and he and his wife own all of the shares of the debtor corporation. Kinsworthy took over the business and became the owner of it on September 27, 1983. When Kinsworthy took over the business, it was at a disaster level. During his tenure, business has increased but unexpected negative events have occurred. A primary one was a large claim in excess of $100,000 for sales tax owed to the state of Indiana which instituted suit for its tax claim. For 1984 the business experienced a loss of $440,000.

To deal with the problems of the business, even prior to filing for chapter 11 relief, debtor instituted savings in the categories of direct labor, general administrative, sale, subcontract labor, and delivery. These savings on an annual basis amount to some $356,932. In addition one of debtor's seven retail outlets was closed. While savings have been achieved, debtor is still operating at a loss. The bankruptcy case was filed when debtor's chief secured creditor informed debtor that it was going to call its loan. That creditor was financing debtor by means of accounts receivable financing. To forestall foreclosure on the accounts receivable, which would have meant the end of debtor, debtor filed the case. After the filing, debtor employed a consultant whose job it is to locate further places for cutting expenses and improve cash flow.

Though the actual date is not specified, the record indicates that during February, 1985 debtor commenced negotiations with its Union regarding its labor contract. Debtor and the Union had a collective bargaining agreement dated as of June 23, 1983 which by its terms would expire June 23, 1985. Debtor and the Union commenced negotiating a new contract to take effect upon the expiration of the old, though counsel for debtor told the Union that if the negotiation were unsuccessful debtor would bring on a motion to reject

the agreement pursuant to 11 U.S.C. § 1113. Debtor filed its application to reject the agreement on March 8, 1985. Prior to that date debtor had furnished the Union with a proposal. Meetings were subsequently held between Union and debtor representatives and several revisions of the proposal were made until one was sufficiently satisfactory to the Union representatives that they took it to the bargaining unit for a vote. The vote occurred on April 18, 1985 and the members of the bargaining unit unanimously rejected the proposal. The § 1113 hearing then ensued on May 8, 1985. Further facts will appear below. We turn first to the statute.

The controlling statute, 11 U.S.C. § 1113 provides in pertinent part:

"(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assur that all creditors, the debtor and all of the af parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement."

\* \* \* \* \* \*

It was the testimony of Mr. Kinsworthy, president of debtor, that the major points contained in this proposal were to (1) cut wages, (2) change rate classes so that employees might be moved around the plant more easily, (3) reduce vacation by one week, (4) reduce holidays by one and a half days, (5) alter the overtime provisions so that four hours of overtime could be required without notice when the employer needed that, and (6) with respect to medical coverage, change coverage from a self funded plan to one with a commercial insurance carrier, fifty percent of the contribution to be made to the employer and fifty percent by the employee.

The debtor calculated that the savings from its proposal regarding changes in the existing agreement would amount to approximately $257,000.00. This calculation was derived as follows: (1) payroll savings plus estimated tax due thereon, $166,-220.29; (2) vacation pay, $15,647.60; (3) holiday pay $8,738.00; and (4) medical $68,-400.00. There were nine subjects dealt with in the proposal given by debtor to the Union, but of these only four had savings for the debtor directly attributed to them, that is, subjects dealt with in the proposal to which no saving was assigned were overtime, shutdowns, job classification, promotion and transfer, and absenteeism and tardiness.

Based on this record we have concluded that the requirements of (b)(1) have not been met. Consequently, we cannot authorize rejection of the collective bargaining agreement. We go no further in applying the tests of § 1113.

While the law regarding rejection of collective bargaining agreements did not begin with *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), there is no question that the legislation which emerged as 11 U.S.C. § 1113 was drafted in reaction to that decision. In the *Bildisco* case, the Supreme Court dealt with two questions. The first was, under what conditions can a bankruptcy court permit a debtor in possession to reject a collective bargaining agreement. The second had to do with whether the NLRB could find an unfair labor practice for unilateral termination of a collective bargaining agreement by a debtor in possession before rejection had been approved by the bankruptcy court. It is the first issue with which we are here concerned. On that issue the Supreme Court reached a unanimous decision. It accepted the proposition that because of the special nature of collective bargaining agreements a stricter standard should govern rejection of collective bargaining agreements than other executory contracts.

The Court, however, rejected a standard favored by labor, that rejection only be permitted when necessary to prevent a debtor from going into liquidation. Instead the Court adopted the standard that rejection be permitted "if the debtor can show that the collective bargaining agreement burdens the estate and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." To this the Court added:

> Before acting on a petition to modify or reject a collective-bargaining agreement, however, the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution. The NLRA requires no less. Not only is the debtor-in-possession under a duty to bargain with the union under § 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5), see post at 18–19, but the national labor policies of avoiding labor strife and encouraging collective bargaining, *id.*, § 1, 29 U.S.C. § 151, generally require that employers and unions reach their own agreements on terms and conditions of employment free from governmental interference. *See, e.g., Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249 [94 S.Ct. 2236, 41 L.Ed.2d 46] (1974); *NLRB v. Burns Security Services*, 406 U.S. 272, 282–294 [92 S.Ct. 1571, 1579–1586, 32 L.Ed.2d 61] (1972). The Bankruptcy Court need step into this process only if the parties' inability to reach an agreement threatens to impede the success of the debtor's reorganization. If the parties are unable to agree, a decision on the rejection of the collective-bargaining agreement may become necessary to the reorganization process. At such a point, action by the Bankruptcy Court is required, while the policies of the Labor Act have been adequately served since reasonable efforts to reach agreement have been made. That court need not determine that the parties have bargained to impasse or make any other determination outside the field of its expertise.

*Id.* at ——, 104 S.Ct. at 1196, 79 L.Ed.2d at 496.

After the *Bildisco* decision, major initiatives were launched at the behest of labor in the House of Representatives and the Senate to overturn that holding. The thrust of the labor effort was to modify *Bildisco* by drafting a statute in which the process of adjudication by the Bankruptcy Court had less of a role to play, while that of negotiation between the parties had a greater role. After different bills emerged from the two Houses, a conference committee undertook to resolve the differences. In the end, while the general approach envisioned by the Supreme Court in *Bildisco* was preserved, the modest modification in the statute ultimately enacted prescribed a more limited role for bankruptcy court intervention, before a bankruptcy court could order rejection. This is what is represented in subparagraph (b)(1).

At that point in the statute, two requirements for the proposal mandated to be submitted by the debtor are spelled out. One is that the proposal provide "for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor." The other is the requirement "that all creditors, the debtor and all of the affected parties are treated fairly and equitably." A review of the test laid down by the Supreme Court in *Bildisco* will disclose that the second requirement is not different from the standard articulated by the Supreme Court in *Bildisco*. It is, then, the first requirement that was the Congressional modification of *Bildisco*. The mandated proposal must deal with the matters specified in the above stated first requirement. Two possible constructions of that language emerge. One construction is that the proposal must deal only with "necessary modifications in the employee benefits and protections that are necessary to permit the reorganization of the debtor." The other possibility is that it is sufficient if these matters are dealt with in the proposal, but the proposal need not be limited exclusively to them.

 The only legislative history with regard to the 1984 bankruptcy amendments are comments in daily edition of the Congressional Record of June 29, 1984 (volume 130) after the work of the conference committee was completed, but before the respective Houses voted on the conference report. A review of that legislative history persuades us that the first construction stated above is what was intended by Congress on the point here being examined. Thus, remarks of Representatives Rodino and Lungren at H 7489 and H 7496, respectively, together with those of Senators Hatch and Packwood at S 8892 and S 8898, respectively, support this conclusion. Particularly telling is the comment by Sen. Packwood at the indicated page on the repetition of the word "necessary" in the statute.

Since we reach this conclusion on the law, and since we have concluded on the facts that matters beyond those necessary to the reorganization were dealt with in the proposal, we conclude that the requirements of (b)(1) have not been met.

A further ground for our decision not to authorize rejection and a very significant factor in it, is the fact that the proposal here made by the debtor was made in connection with the negotiation of a new or successor collective bargaining agreement. The record shows that the existing agreement was to expire June 23, 1985 and the record leaves no doubt that what was going on when the proposal was made, as well as during the subsequent negotiating process, was the negotiation of a new or successor agreement. This undisputed fact lends powerful support to our finding of fact that it was not only matters necessary to permit reorganization which were dealt with in the proposal.

Accordingly, we will deny debtor's application to reject collective bargaining agreement.

The foregoing constitute our findings of fact and conclusions of law.